**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF MISSISSIPPI**
**DELTA DIVISION**

**DEBRA BROCKINGTON**                                                    **PLAINTIFF**

**v.**                                                    **CIVIL ACTION NO. 2:07cv1**

**CIRCUS CIRCUS MISSISSIPPI, INC. d/b/a**
**GOLD STRIKE CASINO RESORT**                                        **DEFENDANT**

### ORDER

This cause comes before the court on the motion of defendant Circus Circus, Mississippi,

Inc. d/b/a Gold Strike Casino Resort ("Gold Strike") for summary judgment, pursuant to Fed. R.

Civ. P. 56. Plaintiff Debra Brockington has responded in opposition to the motion, and the court,

having considered the memoranda and submissions of the parties, concludes that the motion

should be denied as to plaintiff's retaliation claims but granted as to plaintiff's other federal and

state claims.

This is a Title VII sexual harassment and retaliation case arising out of plaintiff's

termination from her position as a bartender at defendant's casino in Tunica County, Mississippi.

Plaintiff was terminated on May 11, 2006, allegedly for violating defendant's attendance policy.

Plaintiff alleges that her termination actually resulted from her having made reports of sexual

harassment at the hands of two Gold Strike employees. Specifically, plaintiff alleges that she

was subjected to sexual harassment from Wanda Haley, a female supervisor of plaintiff's at the

Gold Strike bar, and Ed Ogden, a former boyfriend of hers who also worked at Gold Strike, albeit

at a different location. In the instant action, plaintiff seeks recovery both for the alleged sexual

harassment and for the unlawful retaliation which, she alleges, followed her reporting of same.

1

Defendant presently seeks summary judgment, contending that no genuine issue of fact exists regarding any of plaintiff's claims and that it is entitled to judgment as a matter of law. The court will consider first defendant's motion as it relates to plaintiff's sexual harassment claims against her supervisor Haley. To state a Title VII hostile work environment claim relating to harassment by either a co-worker or supervisor, a plaintiff must first establish (1) that he or she belongs to a protected class, (2) that he or she was subject to unwelcome harassment, (3) that the harassment was based on the plaintiff's protected characteristic, and (4) that the harassment was so severe or pervasive as to affect a "term, condition or privilege" of employment. *Woods v. Delta Beverage Group., Inc.*, 274 F.3d 295 (5th Cir. 2001) (*citing Shepherd v. Comptroller of Public Accounts of the State of Texas*, 168 F.3d 871, 873 (5th Cir. 1999).

In seeking summary judgment, defendant limits itself to an argument that, within the context of this particular casino bar, the alleged harassment by Haley was not sufficiently "severe or pervasive" to alter the terms or conditions of plaintiff's employment. At the summary judgment stage, this court is required to consider the facts in the light most favorable to plaintiff, as the non-moving party. Plaintiff alleges the following acts of harassment by Haley:

> New Year's Eve, Haley started sexually harassing Brockington: "She came behind the bar and said that she was drunk, she was staying with Jennie Poe tonight because she had to be back to work the next morning and grabbed my butt." This happened while both Haley and Brockington were working. After that, every time Brockington worked behind the bar, Haley would be behind the bar working with her: "She would grab my tit, she had popped me on the butt with a towel, she was telling some people at the bar how she liked my breasts." Haley would pop Brockington with a towel practically every night that she worked with Brockington. Brockington told Haley to stop. On January 31, 2006, according to Brockington, "I was approached at the end of the bar by my supervisor; [she] touched my breast telling me she didn't realize how big and nice my tits are, and went and started telling other employees."
> Lisa White worked with Brockington in the bar and witnessed Haley on a

couple of occasions, "slapping her on the butt and putting her hands on her." Sandra Harris witnessed Haley hitting Brockington on the butt. According to Tina Dotson, "she would like swipe her across her bottom and was a couple of times I heard her make comments about Debra's breasts. . .." Dotson testified that when Haley would touch Brockington, she would have a smile on her face and say something like, "nice ass." Charles Kaney, a customer at the bar, witnessed an incident where Haley was "touchy-feely" with Brockington: "And it kind of shocked me what she was saying to her, I mean, she was making comments about her breasts and she was touching her inappropriately in my opinion." Further, "she basically was rubbing her rump . . . she kept saying, tell her to stop. She made comments about her . . . having nice breasts." Kaney asked, "who is she, and she said she is my supervisor. I'm like, really." Brockington told Kaney that it had happened before. Kaney testified that Brockington appeared upset at what Haley had done to her.

Brockington believed that Haley was sexually interested in her. Haley would constantly ask Brockington to go out drinking with her, or to meet her somewhere. Further, "She was always telling me about her sex life and what she would like to do to me." According to Lisa White and Tina Dotson, it was common talk around the bar that Haley was bisexual. Sandra Harris heard Haley say that "there was times that she liked being with a woman . .." Harris also testified that Haley got "friendly" with her when they were at a different casino. According to Tina Dotson, Haley told her on several occasions that she "was bi-sexual, she liked men and women." When asked whether Haley ever told her about women she had sex with, Dotson responded, "There was some from Horseshoe that she had talked about taking home with her. As far as going into detail, I told her I don't want to hear that, that's nasty."

While the aforementioned alleged behavior is reprehensible, the court agrees with defendant that the context in which the alleged harassment in this case arose is a relevant factor to consider, in determining whether it was so "severe or pervasive" as to alter the terms and conditions of plaintiff's employment. The court is certainly not prepared to say, as a matter of law, that the harassment alleged to have been committed by Haley was neither severe nor pervasive merely because it occurred in a casino bar-room.

In the court's view, casino bartenders have the same right as other employees to expect that they will not be subjected to unlawful harassment, and, but for certain other facts in the

record, the court would be inclined to conclude that triable fact issues existed with regard to

plaintiff's sexual harassment claims.  However, plaintiff concedes in her brief that:

> While Brockington had off-color conversations with her female co-workers, like Lisa White and Toni Noe, she never did with her supervisors, like Haley. Also, Brockington and Lisa White would pat each other on the butt, occasionally, to entertain the customers.  But neither were offended by it, thus it was not sexual harassment.

Defendant provides its own, far more extensive, elaboration of the workplace environment at

Gold Strike, as follows:

> Plaintiff frequently joked and talked about sex at the workplace. According to Plaintiff's former co-worker and friend Lisa White, the bar at the Gold Strike Casino was not "church" and things could get pretty "risqué."  The Gold Strike Casino bar was not like "your Mother's house at Thanksgiving," and people at the bar were "more uninhibited, use[d] a little more spicier language" than most work locations.  There was also a lot more "give and take" and a "lot more conversation of a sexual manner" and most people were not offended by that.   Indeed, according to Lisa White, people who were offended by such behavior would not be able to work in the bar very long.  Lisa White observed that Plaintiff and the other bartenders liked to "play and joke and cut-up, meaning talking about sex and making sex jokes at the workplace." No one seemed to be offended by that, including Plaintiff.
>
> According to White, Plaintiff was a "prankster" [who] would frequently say things that were borderline appropriate.   For instance, Plaintiff gave her supervisor, J. J. Borkowski, sexually related gifts such as a blow-up sex doll in order to embarrass him a little bit.  Mr. Borkowski testified that in addition to receiving a blow-up sex doll, Plaintiff also  gave him "soap-on-a-rope" in the shape of a penis.  During her employment, Plaintiff would frequently hit fellow bartender Lisa White on the rear end while at work.   According to Lisa White, it was common for Plaintiff to hit Lisa White on the rear end at work.  Brockington and White would put on "a show" for the customers that came to the bar. According to former Bartender White, Plaintiff started this conduct, which initially embarrassed and caused White to "blush."  After Plaintiff hit White on her rear approximately a dozen times, White "got used to it" and began to reciprocate.  According to White, whenever Brockington did this, she made a "show" of it for the crowd:  Plaintiff would "[h]oot and holler and say, 'Now, pull my hair, pull my hair.'"

In the court's view, this testimony supports defendant's contention that there was no actionable

sexual harassment in this case.

For harassment to affect a "term, condition, or privilege of employment" it must be, both objectively and subjectively, so "severe or pervasive as to alter the conditions of employment and create an abusive working environment." *Watts v. Kroger Co.*, 170 F.3d 505, 509 (5th Cir. 1999). The U.S. Supreme Court has stated that "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788, 118 S. Ct. 2275, 141 L. Ed. 2d 662 (1998)(internal quotation marks omitted). The Fifth Circuit has held that whether an environment is hostile or abusive depends on the totality of the circumstances, focusing on factors such as the frequency of the conduct, its severity, the degree to which the conduct is physically threatening or humiliating, and the degree to which the conduct unreasonably interferes with an employee's work performance. *Hockman v. Westward Communications, LLC*, 407 F.3d 317, 325-26 (5th Cir. 2004).

The stringent nature of the aforementioned standard was demonstrated in the 1999 decision of *Shepherd Comptroller of Pub. Accounts of the State of Texas*, 168 F.3d 871, 872 (5th Cir. 1999). In *Shepherd*, the Fifth Circuit found no severe or pervasive harassment to be present where the plaintiff's co-worker told the plaintiff on one occasion that her elbows were "the same color as [her] nipples;" once simulated looking under her dress while remarking that she had "big thighs;" on several occasions attempted to look down her clothing; on several occasions touched her arm, rubbing it from wrist to shoulder; and, during two office meetings, while pointing to his lap, stated, "here's your seat." *Id.* The Fifth Circuit characterized these actions and comments as "boorish and offensive" but nevertheless concluded that they were not "severe." *Id.* In so

concluding, the Fifth Circuit noted that none of the co-worker's actions physically threatened the plaintiff, nor would they interfere with a reasonable person's work performance or competence. *Id.*

Considered within the context of this stringent authority, which this court has no choice but to follow, the court concludes that an employee who made "off-color" remarks, repeatedly grabbed the rear end of a female co-worker, gave sexually suggestive gifts to a co-worker, and who made sexually suggestive gestures in order to "entertain customers" can not validly contend that similar actions by a supervisor were either "physically threatening or humiliating" nor that such conduct "unreasonably interfered" with her work performance. Indeed, the evidence suggests that plaintiff herself initiated such conduct in the furtherance of her work performance, and she may not establish liability upon the mere fact that a co-worker who engaged in similar conduct with her happened to be a supervisor. The court agrees with defendant that, within the context of plaintiff's work environment, the alleged harassment in this case was neither severe nor pervasive, and plaintiff's Title VII harassment claims are due to be dismissed as to the actions of Haley.

Likewise without merit are plaintiff's harassment claims arising out of separate acts of alleged harassment by her ex-boyfriend Ed Ogden. Plaintiff conceded in her deposition that Ogden never supervised her, and a simple negligence standard applies to allegations that an employer failed to prevent or correct workplace harassment by a non-supervisory employee. In the court's view, plaintiff attempts to impose overly broad liability against Gold Strike in this context, seeking to hold it liable for acts of stalking by Ogden which occurred primarily outside of the workplace. The court agrees with Gold Strike that it acted reasonably in this context by

encouraging plaintiff to report the alleged stalking to police, and defendant notes that the more serious acts of harassment by Ogden occurred outside of the workplace. Gold Strike can not reasonably be expected to supervise the off-duty behavior of its employees who choose to engage in romantic relationships, and none of the alleged acts of harassment which occurred in the workplace come close to meeting the "severe or pervasive" harassment standards as applied by the Fifth Circuit. Plaintiff's sexual harassment claims are therefore due to be dismissed in their entirety.

The court now turns to plaintiff's Title VII retaliation claims against defendant. Retaliation claims arise out of a separate provision in Title VII which makes it an "unlawful employment practice" for an employer to "discriminate" against an employee because that employee "has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). To establish a *prima facie* case of retaliation, plaintiff must demonstrate the following essential elements:

1. she engaged in a statutorily protected activity;
2. she was subject to an adverse employment action; and,
3. there was a causal connection between the protected activity and the adverse employment action.

*Webb v. Cardiothoracic Surgery Assoc.*, 139 F.3d 532, 540 (5th Cir. 1998).

In the court's view, plaintiff has managed to establish a prima facie case of retaliation in this case. The Fifth Circuit has stated that "[c]lose timing between an employee's protected activity and an adverse action against him may provide the 'causal

connection' required to make out a prima facie case of retaliation." *McCoy v. City of Shreveport*, 492 F.3d 551, 559 (5th Cir. 2007). On the other hand, "[t]he cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be 'very close'" *Ajao v. Bed Bath and Beyond, Inc.*, 2008 WL 345505 (5th Cir. 2008), *citing Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273-74, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001). In this case, the temporal proximity between plaintiff's reporting the alleged harassment by Ogden and Haley and the suspensions and termination which followed is, in the court's view, so close as to establish a prima facie case of retaliation. This is particularly true considering that the flurry of disciplinary actions came on the heels of plaintiff's eight-year employment with no serious write-ups or disciplinary actions. Even assuming, *arguendo*, that this temporary proximity is insufficient to establish a prima facie case, the court concludes that the additional evidence discussed below suffices to do so.

Applying the familiar burden-shifting framework, once the employee has established a *prima facie* case, the burden then shifts to the employer to demonstrate a legitimate, non-retaliatory reason for the adverse employment action. *Id.* Once the employer does so, the burden of proof then shifts back to the employee to demonstrate that the employer's non-retaliatory purpose is "merely a pretext for the real, [retaliatory] purpose." *Id.* It appears, but is not certain, that plaintiffs in the Fifth Circuit may also proceed under a mixed-motive theory in retaliation cases. *See, e.g. Richardson v. Monitronics Intern., Inc.*, 434 F.3d 327, 334 (5th Cir. 2005); *Block v. Kelly Services, Inc.*,

2006 WL 2571012 (5th Cir. 2006). Certain Fifth Circuit decisions make continued reference to a "but for" standard being applicable in retaliation cases, *see, e.g. Septimus v. University of Houston*, 399 F.3d 601, 607 n.7 (5th Cir. 2005); *Strong v. University HealthCare System, L.L.C.*, 482 F.3d 802 (5th Cir. 2007) but it appears that this holding is limited to cases where (unlike here) plaintiffs fail to timely raise mixed-motive arguments. *See Campbell v. England*, 234 Fed.Appx. 183, 186 n. 4 (5th Cir. 2007)(noting that *Septimus* held that a "but for" standard applied but emphasizing that the *Septimus* panel did not consider the effect of the mixed-motive option since such was not raised by the plaintiff).

Regardless of the governing causation standard, the court concludes that plaintiff is able to establish triable fact issues regarding whether defendant's stated non-discriminatory reason - plaintiff's violation of its attendance policy - is either a pretext for retaliation (under the "but for" standard, assuming such is applicable) or whether retaliation was otherwise a motivating factor behind her termination. In so concluding, the court notes that plaintiff first served a one-month suspension in February, 2006, which suspension occurred less than a week after she first reported the alleged harassment in this case. Plaintiff's calender notations indicate that she reported Haley's alleged harassment to Jackie West on February 4, 2006 and that she was written up and suspended on February 9, 2006. As noted by defendant in its brief, the February, 2006 suspension related to allegations that plaintiff had improperly given free drinks to a customer:

Following the change in ownership, the Gold Strike Casino issued

"Beverage Policy No. 4" which Plaintiff understood to require that drinks
only be given free of charge if an individual was actually gaming.  Plaintiff
was told by her supervisors, however, that there was an exception to this
policy when the Casino was short staffed on cocktail servers.  On or about
February 9, 2006, Plaintiff received a write-up and was suspended pending
investigation when security cameras saw Plaintiff giving a customer a free
drink in violation of the written policy.  Supervisor Haley "came to bat"
for Plaintiff by explaining this exception and getting Plaintiff's job back
for her.

Thus, defendant does not appear to dispute that the one-month suspension served by

plaintiff was unwarranted, noting that supervisor Haley went "to bat" for plaintiff and got

the suspension lifted by explaining that plaintiff's conduct was within the rules

established by supervisors.  Similarly, plaintiff's fellow bartender Lisa White testified in

her deposition that other bartenders violated that same policy and that, in her view,

plaintiff was singled out for suspension because she had made a complaint of harassment:

> Q: Do you know, what everyone else doing the exact same thing she was?
> White: Yes.
> Q: From your observation, was she singled out for suspension after she
> reported being sexually harassed?
> White: I believe so, everybody worked the same.
> Q: She wasn't doing anything anybody else was doing?
> White: She was not doing anything I didn't do.
> Q: And to your knowledge, nobody else was suspended during that time for doing
> that?
> White: No.

In the court's view, this one-month suspension is significant, both because it occurred

very shortly after plaintiff made a complaint of harassment and because defendant does

not dispute that it was unjustified.  It is unclear to this court why it took such a lengthy

period of time for this matter to be resolved when plaintiff's supervisors were aware that

her behavior was in accordance with their rules.  In the court's view, even a suspension of

a week would be a sanction which a reasonable employee would find to be "materially adverse" within the meaning of applicable U.S. Supreme Court retaliation precedent. *See Burlington Northern & Santa Fe Railway Co. v. White*, --- U.S. ----, 126 S. Ct. 2405, 165 L. Ed. 2d 345 (2006).

Plaintiff was eventually re-instated, but, within a few months, found herself suspended once again, and later terminated, for having twice violated Gold Strike's attendance policy. Plaintiff does not dispute that she violated the policy, but she notes that her first absence was on the same day in which she had been involved in an automobile accident, and she suggests that her employer should have viewed this as an extenuating factor. Plaintiff testified regarding a few other employees who had worse attendance records, with fewer mitigating circumstances, but who were not fired. Helpful testimony in this regard is provided once again by Lisa White, who testified that she herself had violated the same Gold Strike attendance policy for which plaintiff was fired, without being fired herself:

> Q: How many times do you think you slept past that halfway point in your shift before you called in?
> White: I don't know, several.

To reiterate, White expressed her view that the disciplinary measures faced by plaintiff resulted from her having reported sexual harassment, and it is thus apparent that White is a crucial witness as to plaintiff's retaliation claims. Helpful testimony is also provided by Ken St. Aubin, who stated in his deposition that, after plaintiff complained about harassment by Haley, this supervisor would frequently hover around plaintiff, waiting for her to make a mistake. Specifically, St. Aubin testified that "there were numerous times

she would be standing right there at the well, which is on the other side of the bar like just watching over Debra like a hawk."

In the court's view, White's deposition testimony, combined with that of the plaintiff and St. Aubin, supports a conclusion that a jury should be allowed to determine whether unlawful retaliation occurred in this case. The fact that plaintiff worked as a casino bartender for eight years without serious disciplinary measures, only to face a flurry of disciplinary measures very shortly after reporting alleged sexual harassment, clearly raises suspicion regarding possible retaliation. While such temporal proximity alone may be insufficient to permit plaintiff to survive summary judgment, the court concludes that White's deposition testimony and that of the plaintiff and St. Aubin serve to create fact issues in this regard.

Defendant asserts that the decision to terminate plaintiff was made by J.J. Borkowski, a supervisor who allegedly had no knowledge of plaintiff's claims of harassment. It is apparent, however, that the final decision to terminate plaintiff was made at a higher managerial level (following a conference between plaintiff and a human resource manager), and defendant thus may not rely solely upon Borkowski's alleged lack of knowledge of plaintiff's claims of harassment. The court concludes that there exist triable fact issues regarding plaintiff's retaliation claims, and defendant's motion for summary judgment will therefore be denied as to these claims. Plaintiff also raises a host of state law claims such as intentional infliction of emotional distress and retaliatory discharge claims, but the court finds to be a rather garden variety Title VII claim, and there is no indication that the Mississippi Supreme Court would apply these state law

claims in the present context. These state law claims will therefore be dismissed.

In light of the foregoing, defendant's motion for summary judgment is granted in part and denied in part, as more specifically set forth in this order.

So ordered, this the 15th day of May, 2008.

**/s/ MICHAEL P. MILLS**
**CHIEF JUDGE**
**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF MISSISSIPPI**